Thomas v. Carter, Ms. Glaser. On behalf of the defendants' appellants, there were four people being sued for money by a prisoner claiming deliberate indifference to serious medical needs. The defendants' appellants are Ms. Bessie Carter, a nurse, Dr. Dennis Laravia, the former medical director, treating physician. Yeah, no, we know all that. Oh, okay. Just go ahead and move to your legal points. There are no disputes of fact. The issues are all purely legal. The first issue is what the plaintiff's constitutional rights are based on the facts and circumstances. The second legal issue is what the defendants were obligated to do under clearly established law. In this case— Why don't we take the one way of separating this and address whether or not the warden can even appeal. Did you claim qualified immunity in district court for the warden? Yes, Your Honor. Now, as I understand it, the warden was erroneously sued under respondeat superior or a vicarious liability, something. But did you ask for qualified immunity? Yes, Your Honor. And I don't see the basis in your brief for why he would be entitled to qualified immunity. He didn't—what did he do? What is he charged with doing? Well, the reason he's—well, he runs the jail. He had no— I understand that, but— He had no personal involvement in any of the plaintiff's constitutional rights, and thus, absent a constitutional violation or objectively unreasonable conduct by the warden, he's entitled to qualified immunity. But he's—he was not charged with doing anything except respondeat superior, and Judge Berrigan pointed out, well, he can't be liable on that basis under 1983, so—and then she suggested what might be done to keep him in the case, but she just dismissed him without prejudice. I don't know how you have the right to be here—how the warden has the right to be here on this appeal. Certainly those that were denied qualified immunity have that right. She did not deny him qualified immunity. Now, he might have asked for it, but I'm just puzzled as to how on earth we could find he has qualified immunity when he's not charged with doing anything. It's a—as I understand it, Judge Barstow, it's a question of appellate jurisdiction. Right. Yeah. I understand. Well, the—in finding that the warden isn't alleged to have done anything, the judge found that he isn't alleged to have committed a constitutional violation at all, and she suggested— She never found that. She just said he cannot be sued on this basis, so I'm going to dismiss without prejudice, and then she suggested to the plaintiff—and I assume the plaintiff was pro se— At the time, yes. —what he might do or she might—he might do to maybe have a claim against the warden. In his official capacity. Yes. Which does implicate sovereign immunity, which is also appealable. I mean, he is a state employee, and he can't be sued in his official capacity. Yeah, but it's kind of—it's almost interlocutor, and I realize it's a dismissal, but it's a dismissal without prejudice because there's this feeling that there'll be a replete or a possibility of a replete, or ordinarily we allow a pro se litigant to have another opportunity, particularly now if they have counsel and so on. So I guess why are we going to be a replete or what that says? Did he state a claim for policies and procedures and so on that will give rise to that kind of liability? My understanding of the judge's decision is that—well, just procedurally, we were ordered to file a motion for summary judgment on qualified immunity on behalf of all four defendants, which is what we did. And the magistrate judge recommended that the motion be granted, found that all four were entitled to qualified immunity. The district judge, in partially rejecting that report and recommendation, found that the plaintiff hadn't pleaded any action, I guess, by the warden, that he was only sued as respondeat superior, but she affirmed the magistrate judge's finding on the warden, except that she dismissed him with prejudice despite the fact that there were no federal claims properly pleaded against him in his individual capacity, nor was there evidence put on in opposition to the motion for summary judgment on the warden's alleged conduct. I mean, the warden was sued as the warden, and so those claims should have been dismissed with prejudice. Our understanding was that it was qualified—that she found he was entitled to qualified immunity, even though she didn't say it. I mean, we were past the pleading stage at that point. The magistrate judge had long ago found that he had properly stated a claim. In your brief, you simply say, because the warden was—because the plaintiff fails to allege the warden was personally involved in a constitutional violation, because he cannot be sued in an official capacity, you ask us to dismiss him with prejudice, and he hasn't been sued yet, so we don't know what might be done. But we're—I'm sorry, I shouldn't have even brought this up. You've used up about a third of your opening argument on the warden. I'm sorry. It's a big question. It's an unfortunate situation where the warden should never have been involved in the lawsuit, but he was. He wasn't dismissed at the screening stage, which he should have been, but instead we had to file a motion for your time. You're not responding to anything I've asked. Okay. Let me ask you something now about Nurse Carter. The judge construed the claim against Nurse Carter as including a claim for delaying referral to the appropriate specialist or physician, and you didn't brief that, so isn't that point waived as to Nurse Carter? I did not interpret that. We responded to that contention in our reply brief, specifically that that had been waived. I did not read Judge Berrigan's opinion as actually identifying such a claim. She said it was attempted. That was the word she used, and then moved on. I mean, she didn't adjudicate it. She didn't find it was plausibly pleaded like the other claims. She just said he tried to plead that, but even so, she denied qualified immunity from it unequivocally by ordering that Nurse Carter produce insurmountable evidence. Okay, and then you didn't appeal that. You're the appellant. But it wasn't an identified claim, even by Judge Berrigan. Well, she identified two claims, and that was one of them. No, she dismissed one of them. She specifically said she identified two claims, and then dismissed the first one, and allowed the claim on the duty status to move forward. This other claim— In the event you're challenging the denial of qualified immunity, and appointed counsel for the plaintiff has claimed you failed to brief one of these issues, and you respond in your reply brief saying, we didn't even know this was an issue, but here it is. So this might fall under the exception to the rule that we generally don't consider arguments raised for the first time in the reply brief. I think in the light of all this, you probably are entitled to be heard on that point. Thank you, Your Honor. This particular legal claim about a delay of referrals was briefed as to Dr. McVeigh. The law and the facts are the I mean, the referrals that we're talking about were referrals for surgical evaluations, which Judge Berrigan very clearly said is not the claim in the lawsuit, the speed or urgency with which he's getting hip replacement surgery. I mean, he was not—treatment was never delayed. No fact like that was ever identified. And even if somehow or another, referrals to LSU, to make it simple, referrals to the LSU orthopedic department was delayed, they all reached the same result, which is that we're not going to operate right now. So there is no harm, no identified or identifiable harm in the delays by Ms. Carter or Dr. McVeigh or Dr. LaRavia. So I believe that that wasn't a claim brought against Ms. Carter. It certainly wasn't clearly identified. But if it was a claim, the result is the same. I mean, she was denied qualified immunity by being ordered to produce unlimited, insurmountable evidence against it. But as a matter of law, absent a substantial injury or significant injury, a delay in medical treatment does not violate the Eighth Amendment. And we're not even talking about a delay in treatment. We're talking about delays in referrals, which brings us to Dr. McVeigh. That's the same claim that was brought against him. And it, his conduct wasn't objectively unreasonable. Neither... See the doctor that moved on to a different job? No, that was Dr. LaRavia. I, on that point, could not find a case that quitting is objectively unreasonable conduct. I mean, there was no gap in treatment alleged. That could have been a claim against the warden that, you know, if he didn't hire another doctor and they're, you know, they were doctorless for a while, but that didn't happen because Dr. McVeigh came in. So the claim against Dr. LaRavia that he, what was the phrase, maliciously dropped the plaintiff's care to his successor? There's no law to support that. I don't, that can't possibly be a violation of clearly established law to quit. You could quit your job and to, or to refer you to another doctor or to turn over the care. It just, it can't be. And Dr. McVeigh... For example, there's no claim that when he left and moved to a new position, he took all the medical records with him and wouldn't allow the man to have them back or something? No, no. I'm being facetious. Right. No, everybody got all the records that they asked for, both sides in this case. But basically, at the end of the day, the defendants were denied qualified immunity, certainly the two doctors and Ms. Carter. And the law does not support, the law does not clearly establish that any of their alleged conduct violated the Eighth Amendment. Ms. Carter is alleged to have unconstitutionally refused to transfer a duty status. That's not a claim. She, she didn't violate a duty status. There's cases on that. And three days after the plaintiff allegedly asked for a transfer, which is not what the letter said at all, but nonetheless, he mentioned his duty status. Three days later, Dr. LaRavia implemented a duty status. At most, that amounts to a disagreement between medical professionals about what his duty status should have been at the time. Again, not an Eighth Amendment violation. And I, unless y'all have any more questions right now. All right. Thank you, Ms. Leiser. You've saved time for rebuttal. Yes. Thank you. Ms. Mills. Good morning, Your Honors. Alison Mills on behalf of John Thomas. Can you explain to us, first, what is your claim, if you have one, the nature of the claim against the warden? Against the warden? Is it responding, it's superior, or is it? It was. It was. It won't be. I, I think that, that you're correct, that we don't, we don't, we don't even know what we might allege yet, because we haven't replet it, and I can't really speak to, to what claim there might be. I will say, I agree that we don't have a claim for, for monetary damages. The district court suggested that we might have one for injunctive relief. I'll go ahead and tell you, my client is no longer in prison, so we would not sue to compel. So what would be left? I mean, is this an academic debate, then, about whether to dismissal with or without prejudice? Yes, Your Honor. Well, really, a lot of, in my view, when something's an academic debate that you really have no more stake in, you really ought to say that. Well, this just. Spending all this time on something. I mean, I know that's hard for lawyers to concede stuff, but sometimes that's necessary. I agree, Your Honor. I, I did not find out that my client was no longer in prison until Monday. His neighbor called me. Okay. All right. Well, if you're going to. I'm happy, I'm happy to, to tell you that today. Well, we recognize that you're court appointed, and we appreciate what you're trying to do, Ms. Mills. Thank you, Judge. I would, I would like to kind of address. Well, but to finish that point out, if you are no longer claiming that it should have been without prejudice or whatever, if you're conceding that it should be with, because you have no further claims, I mean, I think that would be an appropriate thing to file a, a document with the court for that. If I may, may I consider that and file a letter if. Yeah, I, I mean, obviously, you need to confer with your client, and I understand that. Can, can I ask you to explain, it, it's a little bit confusing with this Nurse Carter. There's a couple of different referrals, but to me, there was clearly one referral that, that judge, I thought that the judge left open, which was this referral from Dr. McVeigh, and the judge did not find that that was dismissed. And so, is that what you're saying was waived by failure to, what are you saying was waived? Oh, I would be happy, I would love to address that issue, too. They said that, that this claim we're talking about wasn't, wasn't clear, made clear in the, the district court's opinion. The district court's opinion at, at page 20 addresses Nurse Carter's conduct. And she says in the opinion, first, plaintiff claims that Nurse Carter expressly ignored his attempt to advise her that he had been scheduled for off-site orthopedic consultations. And she looks at that and she says, not enough there, I don't recognize that claim. Okay, that's not the one at issue. Then she says, plaintiff also claims Nurse Carter's refusal to transfer his duty status from Hunt is a second claim. She addresses that and she says, there's enough there, I'm going to let that one go. Then she says, on the next page, and this is, this is the claim they say she didn't address. Finally, because plaintiff has sought to hold Nurse Carter liable for any intentional delays in the referral process and has included correspondence related to scheduling of a follow-up, the court finds that plaintiff has attempted a claim for Nurse Carter's failure to schedule a follow-up appointment at LSU based on Dr. McVeigh's referral in October 2012. That, that claim is clearly here. So there, there's. She only got rid of the very first right. Right. I'm not sure that claim is here, but I certainly think it's pretty vague and not very precise and concise and I think it's understandable that the state might have overlooked that and I think you raised it in your, your, your brief and now they have responded in their reply. Thank you, Your Honor. I would like to, to kind of address what I think are the two big issues here. Oh, wait, wait, wait. So you, you don't contend there is a waiver anymore? Well, I do, but I'm, I think that's your decision. I don't think they addressed it at all. Do you want to respond to the reply? Well, I think that, that certainly if, if Nurse Carter was aware because my client told her that this referral was out there, then I think we can draw an inference that she was aware that there was a substantial risk that without her response, he would suffer additional harm in the form of, of pain or possibility, a missed opportunity for treatment. Let's do it this way. Since, if we should decide that it's not waived because it's discussed in the reply brief, you're entitled to give us a two-page letter if you wish. That would be your response to that point. You can also, you can also talk about it now, but you can have that opportunity. I would like, I would like to, to kind of frame up what I think are the two big issues and then when we get to that, if you, if you have additional questions, I'd be happy to answer them. Just, just limited to that one discreet thing. Yes, sir. I understand and I appreciate that. I think there are two big issues here. One, you obviously know, is whether there's a clearly established constitutional right at play. And two is whether you have jurisdiction to decide whether a defendant's conduct amounts to deliberate indifference to that right. So I would like to briefly address the constitutional right in question first and then get to the jurisdictional deliberate indifference. No, the first question, as you say, is violation of a constitutional right or statute. But the second question is objectively unreasonable conduct in the face of clearly established law. That's what we're hearing on qualified immunity. We're not deciding the merits of his, of his constitutional claim. You're not deciding the merits based on the facts. But they did argue that there is no constitutional right in question. They said that, that the right here is a right to a hip replacement. That's what they say over and over. There's no constitutional right to a hip replacement. I agree. If I went to jail tomorrow. I think the key question is objectively unreasonable conduct in violation of clearly established law. And I think there is. How is it objectively unreasonable? Well, there, I would like to get to the clearly established law part of that. There is no clearly established law that you have a right to a hip replacement. That's true. But the clearly established law was first announced in Estelle v. Gamble. It was clearly established they cannot be deliberately indifferent to his medical needs, et cetera. But how is, how is their conduct objectively unreasonable? So are we assuming then, Judge Barksdale, that my client does have a serious medical need? No, ma'am. I'm not assuming anything. Then I would like to address that. Okay. Okay. The, the constitutional right, which is medical attention, medical care for a serious medical need. What is a serious medical need? And by the way, this right, like I said, was first established in Estelle v. Gamble and has been recognized by this court many, many times. There is no doubt that it's clearly established. The question is, does he have a serious medical need? And under Estelle v. Gamble and this court's precedent, a serious medical need is one for which you suffer excruciating pain or not even excruciating pain. We have excruciating pain. Pain and suffering that serves no penological purpose or a condition for which treatment has been recommended. And we have both here. There's no one disputes that my client suffers excruciating pain. And every doctor that has seen him has agreed that he needs a hip replacement. My client who, you know, he's a veteran and in 2011, before he went in, he was scheduled for this hip surgery. Since 2011, this condition has deteriorated to the point that at his last medical exam, which was in May of 2013, which the magistrate judge ordered, he has bone-on-bone articulation in his right hip. He suffers terrible pain. And every doctor that has seen him has agreed he needs the hip replacement. We have a serious medical need. Now they say it can't be serious because it's not medically necessary to save his life. That is not the test. A condition to be serious to warrant some care doesn't have to kill you. They say, oh, well, you know, he doesn't have a right under the circumstances because there have been state budget cuts and we can't afford it. That also is, I think, irrelevant to whether he has a serious medical need. The fact that they maybe can't afford the care and I don't know that they can. Part of the problem is not whether this prisoner should have been handled differently, but whether you've got really the right defendants. I mean, and I realize it wasn't you, your client. Your client sued a guy whose crime was that he left the job and went to a different job. I'm going to get to that. Okay. Then he's upset about a nurse who has done what she, with the one possible exception of this referral issue, has done what she's supposed to do. Nurses can't go around doing hip replacement surgeries. Even Dr. McVeigh, what is it that he's supposed to do? I mean, the problem really to me is not whether your client has some need that hasn't been met, but whether he sued the right people. And I realize you weren't involved from the start and things might have looked a little better had you been. And the fact that he's pro se doesn't mean he's wrong and I don't mean to imply that. But do we have the right people for a constitutional violation as to this guy? I think we do. And you know what? I'm going to move on to that.  I think that what we have here is insufficient evidence. I think the question of whether these people on this record may be held liable for deliberate indifference, I think we've got those facts. But I don't even think you get there. Because I think the district court determined that there should be more discovery. She denied the motion for qualified immunity essentially based on an insufficiency of the evidence. And there is a long, long, long line of cases from this circuit that say, well actually it stems from Supreme Court precedent, that say you cannot review that denial of a motion for summary, excuse me, a motion for qualified immunity. And so I think you don't even have to get there. You don't even have to decide whether there's deliberate indifference here. But if you do, I think you can. I think the district court determined that my client could prove deliberate indifference if he showed that the defendants either prevented him from obtaining an orthopedic consultation or refused his request for adjustment to duty status. And with respect to Nurse Carter, there's certainly evidence that shows she did delay my client's referrals and that she also did resist his request for adjustments to duty status. With respect to Dr. Laveria, you know, you said how can he be held liable simply for quitting his job? The record is that he received an MRI in November 2011 that showed that my client, who has been complaining for week after week, month after month, saying my hip is killing me. He had a broken tooth. They said, how bad does that hurt? My tooth doesn't hurt, but my hip is killing me. Dr. Laveria receives an MRI that shows that my client may have suffered a stress fracture and he doesn't see him before he quits his post in January 2012. That's sufficient to find deliberate indifference even on this record. Wasn't he on pain meds? Yes, my client did have ibuprofen and Motrin. The rule is that you're supposed to address the pain. Granted, all of us would go get the hip replacement and all of that, and he can't do that on his own, and I get that. But at the same time, if the question is pain, are they deliberately indifferent to his pain and they're giving him pain meds? Isn't that an answer to that? Well, I think these are fact questions. And, you know, we agree that the record as it exists is accurate as to what it says. But my client, even before I got involved, said that the record is missing papers. And he sent me papers that he says are missing. I think this gets back to we have an insufficiency of the evidence case. And you don't have jurisdiction to review that part. And you shouldn't even get to it. But to the pain question, Judge Haynes, and this goes to Dr. McVeigh's conduct. You know, you said, well, what did he do? Dr. McVeigh had a meeting with my client in July 2012. And, you know, my client is mute, so he communicates by scrawling on paper. I'm sorry, I can't understand you. He had a meeting in July 2012, and then you said, and you know my client, what? My client is mute, so he communicates by scrawling on paper. And in this instance, Dr. McVeigh also communicated by scrawling on paper. So we have this written evidence. And Dr. McVeigh wrote, I agree you need hip surgery. And promised to refer my client to an orthopedic specialist. He also said, would you like a wheelchair? And my client said, yes. Okay, that was July 2012. Dr. McVeigh didn't actually make the referral that he promised until October. And my client didn't get a wheelchair until February 2013. And he didn't actually get the consultation until May 2013 after the Magistrate Judge ordered doctors to examine him. So if you reach this issue, I think what you can find is they had knowledge from which an inference could be drawn, that my client would suffer substantial harm without intervention, and that he suffered substantial harm. I mean, what we have here is they clearly had knowledge. I guess the question is, if they are addressing the pain, can you ever find them liable for deliberate indifference to pain? Well, I think. If they are addressing it, even if they're not addressing it the way you'd like. Because we have a lot of cases where, you know, somebody wants dentures, but they're on a soft food thing, and that's considered good enough, even though most people would rather have the dentures, et cetera. And so here, if he's getting pain meds, that's addressing his pain. Yes, it would be nice to have the sort of Cadillac treatment, but if he's at least getting something. I agree. I agree that if he's getting something, we have a fact question as to whether it's enough. Well, no. I mean, the problem is, on qualified immunity, you have to show, as Judge Barksdale mentioned, that it was objectively unreasonable. So if they are taking steps to address the pain. I mean, part of the problem is, it's not entirely clear to me that all of these people have the authority to do what you're asking. In other words, to actually go and do the surgery, to actually whatever. And so, if they are taking steps to address the pain, is it objectively unreasonable for them to do that? That's the qualified immunity question, not whether they could have handled it better. Well, let's take Dr. McVeigh's example. Is it, and I know that in their briefs, the opposing counsel has said, well, they didn't say they're suing over some right to a wheelchair. But let's take that example. Is it objectively reasonable that it took Dr. McVeigh more than a couple of months, ultimately, to make the referral he promised, and that my client didn't get a wheelchair until February 2013? Honestly, I don't know that Dr. McVeigh could go get the wheelchair. I mean, I don't think Dr. McVeigh has to reach into his own pocket and buy a wheelchair. So that's what I'm saying. That's the problem. Right. I see. I see. I think that what we have here, and bear in mind, I, you know that my client is mute. Normally at a Spears hearing, a prisoner has an opportunity to fully articulate his claims, and the court can hear that and take that into consideration. The Spears hearing in this case was very difficult by all accounts because my client had to hear, you know, the court through the telephone and then write his responses to the court's questions down.  And I think what we're dealing with here is a less than full picture, but there's enough that if you even reach this second issue, which I don't think you should, you could find that the facts that exist support deliberate indifference, and we should go back to the district court and develop this. I would, in closing, just say that I think a case that can guide you here is Easter v. Powell. In that case, and that's a case from this circuit, the prisoner had a heart condition for which he had been prescribed nitroglycerin. And one night he wakes up, and he's having severe chest pains, and he goes down to the duty nurse and says, you know, I'm suffering. Can you help me? And she did not ignore him. You don't have to ignore him. You don't have to prove that the defendants ignored you. She did not ignore him. She took his blood pressure, and she sent him to the pharmacy. Well, he gets to the pharmacy, and the pharmacy's closed. So he goes back to the nurse, and he says, you know, the pharmacy's closed. I really need something. And she said, oh, you're being argumentative. And so she had him sent back to his jail cell. Actually, she had him carried back. And he gets there, and for the next four hours, he suffers excruciating pain to the point that he alleged that a blood vessel burst in his left eye. The next morning, he got up. He received the nitroglycerin. He felt better. But he sued over that four hours of pain and suffering. And she filed a motion. The nurse filed a motion for qualified immunity, like the defendants here, and said, oh, he's just disputing the course of treatment. He's just complaining about this delay. He can't recover for that. And this court disagreed. This court said, no, he had a serious medical need. He had a constitutional right to attention for that. And, quote, he clearly stated an Eighth Amendment violation with regard to the severe chest pain he suffered during the period of time, that's that four hours, the nurse refused to treat him. And I think under Easter v. Powell, my client certainly has a right to recover against defendants for his pain and suffering, too. So thank you. Thank you, Ms. Mills. Ms. Blaser, you've saved time for rebuttal. Ms. Blaser. Really quickly, we had no idea Mr. Thomas had been released. His release date was supposed to be in March. I had no idea he was out. So I'm sorry about that. They didn't call me. Anyway, jurisdiction. An insufficiency of evidence in the record, which was not very specific to the court, didn't specify what insufficiencies there were. She suggested that the defendants bear the burden of producing evidence to prove that they did not act with deliberate indifference, which is contrary to precedent. They— Yeah, but where the defendants are in possession of the only evidence, in other words, medical records of the prison treatment or whatever, I think just basic rules of discovery and so forth are that you can't say, well, I'm not going to but you better prove what we did. I mean, I don't think you can have it both ways on that. The medical records have been produced. But he's saying there's deficiencies in them or something missing. That's the first I'm hearing of it. He filed a complaint, an amended complaint, a response order to a Watson questionnaire and the Spears hearing in addition to opposing the MSJ and objecting to the report and recommendation. And this is the first I'm hearing of missing pages from the medical record that apparently he had to give to his lawyer. I don't understand. And I also don't know what they say. But if there are additional pages missing from the medical record, that means that there's additional treatment that was done. I mean, when there's an absence— I don't know. The record could be him scribbling a note, I'm in pain, and her scribbling back, too bad. And that could be the missing document, and I'm not sure that would help you. But I think Mr. Thomas could certainly have written that down. I mean, he would have been present when that happened, and he didn't. That's not what he's claiming. That's never been what he's claiming. He's claiming that in 2009, two years before his conviction, he had been scheduled for hip surgery at LSU. It has never been proven. That's just the claim. It's been accepted. He was on a waiting list for surgery. He didn't get it. He got arrested for drunk driving. He went to jail. He wanted the surgery. That's it. That's all he ever wanted. That's what the magistrate judge determined he wanted. And then the district judge says, well, yeah, if that's what he wanted, he wouldn't have a claim, because the law doesn't support that we have to give inmates surgery that's not medically necessary, according to the surgeons. And she said the current impediment to surgery are the surgeons, not these defendants. Okay. And what is your analysis of this issue of pain? You have to do something about the pain. Is it enough to just put him on pain meds and not address the source of the pain? Is that acceptable? That's not all they did. That's not my question. Okay. Is that acceptable? I mean, I think that it would depend on the situation. As a matter of law, addressing pain with pain medication is not ignoring or intentionally mistreating the condition, which would thus make it not deliberate indifference. You know, if they intentionally gave him pain medicine he was allergic to so he didn't take it, you know, that's something, that's not what happened. I mean, he had pain medicine. He had a walker, a cane, a wheelchair. The wheelchair, by the way, in February that he didn't get until February, I don't know why that happened, but there's no allegation that Casey McVeigh prescribed him a wheelchair and then withheld it. Well, the problem is, in a lot of these cases, the thing that the person wants, that doctor isn't required to pay for. So he puts in his form and some other person and some desk somewhere is the one who has to fill it and it just takes months and whatever. And I agree with you, that's not the doctor's problem, but what about this delay to October of making the referral at all? That would seem to be within Dr. McVeigh. That's not true. It's in our brief. The referral was in October. He saw the orthopedist via telemed in November. Yeah, but she's saying that the referral should have been made in July. So what's your answer to those couple of months? I don't know. But there's no allegation that it was any of the defendants, but even if it was, so what? I mean, I hate to sound catty, but as a matter of law, the delay in treatment has to cause significant injury. The delay in referral to the orthopedic surgeon who over and over and over says we're not going to operate, they keep saying the same thing. There's no significant injury, thus as a matter of law. There's no constitutional violation. All right, thank you. Thank you. All today's cases are under submission and the court is in recess.